UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, STATE OF CONNECTICUT, and COMMONWEALTH OF MASSACHUSETTS, | ) ) ) ) ) | |
| Plaintiffs | ) ) ) | |
| v. | ) ) | Civil Action Nos.   99-30225-MAP |
| GENERAL ELECTRIC COMPANY, | ) ) | 99-30226-MAP 99-30227-MAP |
| Defendant | ) | |

MEMORANDUM AND ORDER WITH REGARD TO
DEFENDANT'S MOTION FOR JUDICIAL REVIEW OF UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY'S DECISION IN DISPUTE
REGARDING COST REIMBURSEMENT FOR THE GE-
PITTSFIELD/HOUSATONIC RIVER SITE
(Document No. 188)
December 5, 2013

NEIMAN, U.S.M.J.

Presently before the court is a cost-reimbursement dispute between Defendant

General Electric ("GE") and Plaintiff United States of America, more particularly the

Environmental Protection Agency ("EPA"), arising out of a Consent Decree approved by

District Judge Michael A. Ponsor on October 27, 2000.  The Consent Decree was a

product of a complaint filed by the United States on behalf of the EPA, the Department

of the Interior, and the National Oceanic and Atmospheric Administration pursuant to

Section 106 and 107 of the Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607, Sections 3008 and 7003 of

the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928 and 6973,

and other statutes.  The Consent Decree governs the environmental investigation and

cleanup of a site located in Pittsfield, Massachusetts, which extends downstream on the

Housatonic River through western Massachusetts and Connecticut.  For most areas of

the site, cleanup activities are either completed or will be completed soon.  However,

the remedy for the "Rest of River" ("ROR"), defined as

> the Housatonic River and its sediments and floodplain areas
> downstream of the confluence of the East and West Branches
> of the Housatonic River, including backwaters, except for the
> Actual/Potential Lawns, to the extent that such areas are areas
> to which Waste Materials that originated at the GE Plant Area
> have migrated and which are being investigated and/or
> remediated pursuant to this Consent Decree

(Consent Decree ("CD") IV, Definitions), has not been selected.  At the center of the

instant dispute are costs associated with the EPA's activities leading up to a formal

selection of a remedy for the ROR.

The Consent Decree includes several cost-reimbursement provisions, three of

which are presently at issue, namely, those which allow the EPA to recover for "Future

Response Costs," "Oversight Costs," and "Capped Response Costs."  The EPA

submitted a bill to GE for costs on January 11, 2012, claiming reimbursement under the

"Future Response Costs" provision.  All of the costs were incurred in fiscal year 2011.

GE contests $1,192,533 of the $1,239,108 costs billed as Future Response Costs,

arguing in the main that they actually fall into either the Capped Response Costs

category or the Oversight Costs category, which is also capped.

The case as postured raises three basic issues: (1) the appropriate standard of

review; (2) whether the EPA is barred from recovery because the agency failed to follow

the Consent Decree's sequential process for the selection of an ROR remedy; and (3) if

not barred from recovery of these costs, whether and to what extent the costs billed by

the EPA are properly classified under the Consent Decree as recoverable Future

Response Costs.  The parties have consented to this court's jurisdiction for the

resolution of this particular dispute pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P.

73. (*See* Document No. 205.)  For the reasons which follow, the court will find certain of

the billed costs reimbursable by GE as Future Response Costs.

I. BACKGROUND

*A. Consent Decree Process for Development of ROR Plan*

Generally speaking, the Consent Decree outlines a process whereby GE takes

an action, the EPA approves the action, and GE moves on to the next step in the

process of developing an ROR remedy.  (*See* CD ¶ 22.)  In applicable part, the Consent

Decree requires GE to develop and submit to the EPA a Corrective Measures Study

("CMS") Proposal in accordance with GE's RCRA permit.  (CD ¶ 22.j.)  The RCRA

permit provides that

> [i]n the CMS Proposal, [GE] shall identify the corrective
> measures it proposes to study and provide a justification for the
> selection of the corrective measures proposed for study,
> including a description of the methodology proposed to be
> used in evaluating the corrective measures.  The justification
> shall consider the ability of such corrective measures to
> achieve the [interim media-protection goals].

(RCRA Permit II.E.)  After GE submits the CMS Proposal, the RCRA permit continues,

the "EPA will either approve, conditionally approve or disapprove the Proposal." (RCRA

Permit II.F.)  If the EPA approves the CMS Proposal, the Consent Decree requires GE

to carry out the CMS as well as develop and submit a CMS Report.  (CD ¶ 22.k.)

The CMS Report is to provide information on each alternative corrective measure

approved for evaluation in the CMS Proposal, addressing the following: how the alternative would provide human health and environmental protection, reduce or minimize possible releases, and meet applicable or relevant and appropriate state and federal requirements.  (RCRA Permit II.G.1.a-c.)  With respect to each alternative, the CMS Report must also address the following: long-term reliability and effectiveness, attainment of interim media protection goals, reduction of toxicity, mobility, or volume of wastes, short-term effectiveness, implementability, and costs.  (RCRA Permit II.G.2.a-f.) Finally, the CMS Report must conclude "with a recommendation as to which corrective measure or combination of corrective measures, in [GE's] opinion is best suited to meet the general standards" and criteria listed above.  (RCRA Permit II.G.3.)

The Consent Decree also provides for formal public notice and comment, as follows:

> 22.n. Upon satisfactory completion of the CMS Report in accordance with the Reissued RCRA Permit, EPA will issue a Statement of Basis and a draft modification to the Reissued RCRA Permit, which will set forth the proposed Remedial Action for the Rest of the River and [Operation and Maintenance], to be implemented by [GE] pursuant to CERCLA and this Consent Decree.  EPA will propose this draft permit modification pursuant to the Reissued RCRA Permit and EPA's regulations on RCRA permit modifications (40 C.F.R. § 270.41 and Part 124), including the provisions requiring public notice and an opportunity for public comment on the draft permit modification.
>
> 22.o. Following the close of the public comment period, EPA will notify [GE] of its intended final decision on the modification of the Reissued RCRA Permit.  [GE] shall have the right, within 30 days of such notification, to invoke administrative dispute resolution pursuant to Paragraph 135 of Section XXIV (Dispute Resolution) of this Consent Decree with respect to such notification.

(CD ¶¶ 22.n and 22.o.)  In turn, the RCRA Permit states that after GE "submits the CMS Report, EPA will either approve, conditionally approve, or disapprove the Report." (RCRA Permit II.H.)

The parties agree that, after obtaining approval by the EPA of its CMS Proposal, GE submitted an initial CMS Report on March 21, 2008.  They also agree that, in response to input on the CMS Report, GE performed additional analyses and submitted a Revised CMS Report to the EPA on October 11, 2010.  They agree as well that, to date, the EPA has not approved or disapproved either the original or the revised report. The parties disagree, however, as to where they are in the sequential process and, more fundamentally, whether the process has been properly followed.  These disagreements go to the heart of the classification of the costs for which the EPA seeks reimbursement.

### B. Cost-Reimbursement Provisions of the Consent Decree

As mentioned, the Consent Decree defines -- and in some instances limits -- GE's obligation to reimburse the EPA for costs incurred in connection with the ROR planning and cleanup process.  Three of those provisions are at the center of the instant dispute, Future Response Costs, Oversight Costs, and Future Capped Response Costs.  The parties agree that if the billed costs properly fall into the Future Response Costs category, as the EPA argues, it can recover its expenses from GE because that category is not limited to a specific dollar amount.  The parties further agree that if the costs fall into one of the other two categories, as GE asserts, the EPA cannot recover such costs because the limits of GE's liability under those categories have already been met and paid, $11 million in Oversight Costs and $14.5 million in Future Capped

Response Costs.

In all, the EPA is seeking $1,239,108 as Future Response Costs.  GE contests

$1,192,533 of those costs, broken down as follows:

> (1)  Community input workshops and charrette ($418,960);
>
> (2)  Input and review of proposed remedies for the river by
>       the EPA's internal review entities, National Remedy
>       Review Board and Contaminated Sites
>       Technical Advisory Group ($366,930);
>
> (3)  Legal fees for EPA attorneys and advisors ($147,044);
>
> (4)  Costs incurred by the Department of Justice ($87,000);
>
> (5)  Citizens Coordinating Council costs ($22,080);
>
> (6)  Costs associated with a data management contractor
>       ($43,680); and
>
> (7)  Cross-cutting costs ($106,839).

In essence, GE asserts that these costs do not fall into the Future Response Costs

category.

The relevant Consent Decree language of each category, with certain emphases

for later discussion, follows.  Future Response Costs are defined as:

> *all direct and indirect costs that EPA and DOJ incur pursuant
> to the provisions of this Consent Decree, including but not
> limited to costs incurred to enforce the Consent Decree . . .
> non-field work costs incurred for preparing, reviewing, and
> approving the documents that propose and select the Rest of
> River Remedial Action (including responding to public
> comments thereto)*, and costs incurred to develop plans or
> reports pursuant to the provisions of this Consent Decree that
> do not fall within the categories of costs excluded from U.S.
> Future Response Costs by the last sentence of this definition,
> together with any accrued interest. . . . U.S. Future Response
> Costs shall not include U.S. Oversight Costs, U.S. Future Rest
> of River Capped Response Costs, U.S. Future Additional

Sampling Costs, U.S. Rest of River Oversight Costs, U.S. Post Removal/Groundwater Monitoring Costs, or the U.S. 1 ½ Mile Reach Removal Action Costs.

(CD IV, Definitions.)  Oversight Costs are defined as:

all costs, including, but not limited to, direct and indirect costs . . . *in conducting the following activities: . . . reviewing proposals, reports, studies and other deliverables submitted by [GE]* under the Reissued RCRA Permit, conducting shadow or supplemental studies for the studies to be conducted by [GE] under that Permit, and otherwise overseeing [GE's] activities under that Permit, all prior to the modification of that Permit to select the Rest of the River Remedial Action pursuant to Paragraph 22.p of this Consent Decree.  U.S. Oversight Costs shall include, but not be limited to, payroll costs, contractor costs, travel costs, laboratory costs, *community relations costs*, technical support costs, *interagency and intergovernmental agreement costs* (including ATSDR and U.S. Army Corps of Engineers costs), costs of maintaining a Field Office, *data management costs,* and modeling costs, *insofar as such costs are incurred for the activities described in the first sentence of this definition.*  U.S. Oversight Costs shall not include U.S. Rest of River Oversight Costs, U.S. Post-Removal/Groundwater Monitoring Costs, U.S. Future Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1 ½ Mile Reach Removal Action Costs.

(CD IV, Definitions.)  And Future Capped Response Costs are defined as:

all costs EPA incurs . . . including but not limited to direct and indirect costs, *in connection with studying or otherwise investigating the Rest of River and/or all field work to support the preparation, development, and selection of the Rest of River Remedial Action*, all prior to the modification of the Reissued RCRA Permit to select the Rest of River Remedial Action pursuant to Paragraph 22.p of this Consent Decree. U.S. Future Rest of River Capped Response Costs shall include, but not be limited to, costs that EPA incurs for sampling and analysis in the Rest of River, performance of human health risk assessment(s), performance of ecological risk assessment(s), modeling, *data management*, preparation of reports, *peer input, peer review*, general contractor costs (including, for example, administrative record development,

7

> project administration, project management, health and safety) *interagency and intergovernmental agreement costs* (including costs of ATSDR and Army Corps of Engineers), and costs of maintaining a Field Office, *insofar as such costs are incurred for the activities described in the first sentence of this definition.* U.S. Future Rest of River Capped Response Costs shall not include U.S. Oversight Costs, U.S. Rest of River Oversight Costs, U.S. Post-Removal/Groundwater Monitoring Costs, U.S. Future Response Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1 ½ Mile Reach Removal Actions Costs.

(CD IV, Definitions.)  It should be noted that, when costs fall into multiple categories, the Consent Decree allows EPA to allocate costs among categories using a "reasonable allocation method," referred to by the parties as "cross-cutting" costs.

### C. Dispute-Resolution Process in the Consent Decree

Prior to the initiation of GE's present motion, the parties engaged in the dispute-resolution procedure called for by the Consent Decree.  To a degree, this procedure implicates this court's standard of review.

As part of the procedure, the parties must first engage in informal negotiations. (CD ¶ 133.)  If those negotiations are unsuccessful, GE may invoke a formal dispute-resolution process before the Director of the Superfund Office within EPA Region 1;  GE can initiate this process by sending the Director a "Statement of Position" regarding the dispute.  (CD ¶ 135.a.)  The Statement of Position must specify whether formal dispute resolution should proceed under Paragraph 136 or 137 of the Consent Decree.  Here, the parties agree that Paragraph 137 applies.  This court's review under Paragraph 137 "shall be governed by applicable principles of law."[1]  (CD ¶ 137.b.)

---

[1] Paragraph 137 applies to "[f]ormal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law."  In

GE submitted its Statement of Position on July 2, 2012.  The EPA submitted its

own Statement of Position on July 30, 2012, to which GE replied.  On January 31, 2013,

the Deputy Director issued a decision upholding the EPA's claim "for the reasons

described" in the EPA's Statement of Position.

## II. Discussion

The court will first address the proper standard of review.  It will then examine the

merits of GE's "alternative" argument, namely, that the EPA's failure to follow the

Consent Decree's sequential process precludes it from recovering its billed costs; this

argument needs to be addressed before the court analyzes the billed costs themselves

because, if accepted, it would entirely preclude consideration of the EPA's request.

Since, for the reasons which follow, the court will reject GE's alternative argument, it will

go on to address whether and to what extent the EPA is entitled to reimbursement for

the enumerated costs under the Consent Decree.

### A. Standard of Review

As indicated, the parties agree that, pursuant to Paragraph 137.b of the Consent

Decree, this court's review of this dispute is "governed by applicable principles of law."

(CD ¶ 137.b.)  The parties also agree that the court's review is *de novo*.  However, that

is where the parties' agreements end.  GE asserts that *de novo* review precludes the

court from according any deference to the EPA; rather, GE contends, the court simply

---

contrast, Paragraph 136 applies to "formal dispute resolution for disputes pertaining to
the selection or adequacy of any response action and all other disputes that are
accorded review on the administrative record under applicable principles of
administrative law . . . . " In Paragraph 136 disputes, GE "shall have the burden of
demonstrating that the decision of the [Director] is arbitrary and capricious or otherwise
not in accordance with law."  (CD ¶ 136.d.)

needs to interpret the Consent Decree as a contract.  The EPA counters that the Consent Decree is not a contract between two private parties, but a "public law decree." Accordingly, the EPA argues, if any terms in the Consent Decree are ambiguous, the court should accord the EPA's interpretation of those terms deference so as to achieve the decree's public interest objectives.

It is true, as the EPA asserts, that "district courts enforcing public law consent decrees have, in general, broad discretion in determining such matters as whether the objectives of the decree have been substantially achieved." *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991).  And, while courts generally construe commercial-litigation consent decrees like contracts, "programmatic decrees entered into in public law litigation will often warrant a more flexible approach." *Id.* at 1337-38.  Such judicial discretion in public law litigation may be crucial for the court to secure complex legal goals. *Id.* at 1338.

Deference to an administrative agency's technical expertise, however, is not applicable to all matters involving public law consent decrees.  Disputes that involve the determination of "the parties' original intent and . . . the scope of the arrangement to which they initially consented" do not warrant such deference.  *Quinn v. City of Boston*, 325 F.3d 18, 30 (1st Cir. 2003).  Rather, in such situations, " '[o]rdinary contract principles apply' to the same extent as they apply to other consent decrees." *Id.* (quoting *Navarro-Ayala*, 951 F.2d at 1339).  The rationale behind this rule is that "[p]arties to a consent decree are entitled to know that . . . [it] will not be treated as a mere entering wedge which . . . gives a district court untrammeled discretion to increase the depth and breadth of judicial supervision." *Id.* (quotation omitted).

10

Here, in the court's estimation, the parties are not seeking a judicial

determination as to whether the objectives of the Consent Decree have been achieved.

Rather, the issues before the court involve the parties' original intent and scope of their

agreement.  Thus even assuming, as the EPA suggests, that the Consent Decree arose

out of "public law litigation," *see generally* A. Chayes, *The Role of the Judge in Public

Law Litigation*, 89 HARV. L. REV. 1281 (1976), the EPA's construction of the Consent

Decree is not entitled to any particular deference.

That said, the First Circuit directs that a court look to a consent decree's "four

corners" to resolve questions of its interpretation.  *United States v. Charter Inter. Oil

Co.*, 83 F.3d 510, 516 (1st Cir. 1996).  Thus, the interpretation of a consent decree is

analogous to the interpretation of a contract.  *See AMF Inc. v. Jewett*, 711 F.2d 1096,

1100 (1st Cir. 1983) (referring to the process of interpreting the meaning and purpose of

a consent decree "as analogous to the interpretation of contracts"); *United States v.

Witco Corp.*, 76 F. Supp. 2d 519, 525 (D. Del. 1999) (in CERCLA context, "[t]he decree

is to be construed as a contract for the purposes of enforcement of its terms").  In short,

"[t]he terms of the consent decree . . . like any contract construction issue, present an

issue of law that [the court] review[s] de novo."  *Ricci v. Patrick*, 544 F.3d 8, 17 (1st Cir.

2008); *accord United States v. Chromalloy Am. Corp.*, 158 F.3d 346, 349-50 (5th Cir.

1998) ("General principles of contract interpretation govern the interpretation of a

consent decree.  Thus, consent decrees are to be construed only by reference to the

'four corners' of the order itself. . . . Interpretation of unambiguous contract is a question

of law that this court reviews *de novo*." (citations omitted)).

The First Circuit describes the "four corners" rule as follows:

11

> "Since a consent decree or order is to be construed for
> enforcement purposes basically as a contract, reliance upon
> certain aids to construction is proper, as with any contract.
> Such aids include the circumstances surrounding the formation
> of the consent order, any technical meaning words used may
> have had to the parties, and any other documents expressly
> incorporated in the decree."

*Charter Inter. Oil Co.*, 83 F.3d at 517 (quoting *United States v. Continental Baking Co.*, 420 U.S. 223, 238 (1975)).  "As in most contract interpretation questions," the First Circuit continued, the court must begin "with the text." *Id.; see also* 11 R. LORD, WILLISTON ON CONTRACTS § 30:2 (4th ed. 2012) ("The rules for the construction of contracts are all subordinate to the cardinal principle that the intention of the parties, to be gathered from the whole instrument, must prevail unless it is inconsistent with some established principle of law.") (footnotes omitted).  Accordingly, the court here will look to the text of the Consent Decree, as well as the RCRA permit, as it was expressly incorporated into the decree.  (*See* CD ¶ 22 ("Additional studies of the Rest of the River and the selection of a Remedial Action for the Rest of the River shall be conducted in accordance with the Reissued RCRA Permit and the following provisions.") *See also In re Olympic Mills*, 477 F.3d 1, 14 (1st Cir. 2007) (discussing principle of contract interpretation concerning separate writings expressly incorporated by reference).

### B. General Overview of the Parties' Arguments

The EPA argues that "Future Response Costs" is defined as including "all" costs incurred pursuant to the provisions of the Consent Decree that are not otherwise within certain capped categories, such as Oversight Costs and Capped Response Costs. Thus, the EPA asserts, Future Response Costs is a "catch all" definition that includes all costs incurred pursuant to the Consent Decree, excluding only certain capped

12

categories of costs.  Accordingly, the EPA argues, the court need only answer two questions: (1) were the costs at issue incurred "pursuant" to the Consent Decree, and (2) do the costs fall within any of the capped categories?

For its part, GE asserts that the contested costs are either Oversight Costs or Capped Response Costs and, therefore, not recoverable as Future Response Costs.  In essence, GE maintains that there is a clear temporal element to these three categories. The first two, which have already reached their limits, involve the EPA's review of GE's submittals (including its evaluation of remedial alternatives) as well as the EPA's own studies and investigations prior to its decision regarding the ROR remedy.  The third category, Future Response Costs, relates to the last stage in the process when, having considered all pertinent studies and evaluations, the EPA documents its decision by preparing, reviewing, and approving a remedy proposal and responding to public comments thereon.

Here, GE claims, the EPA incurred the costs at issue while it was evaluating GE's study of proposed remedial alternatives and while it was considering its own alternatives, thereby falling into one of the first two categories.  Most importantly, GE asserts, the EPA has still not reached the third stage of deciding on a proposed remedial alternative, let alone documenting that proposal.  Specifically, GE emphasizes that Future Response Costs include those incurred while the EPA is "preparing, reviewing, and approving the *documents* that propose and select the Rest of River Remedial Action."  (CD IV, Definitions (emphasis added).)  In GE's view, the stressed language references the EPA's preparation of a Statement of Basis, the draft and final modifications to the RCRA permit, and the costs associated with responding to public

13

comments on its proposed remedy.  (*See* CD ¶ 22.n ("Upon satisfactory completion of the CMS Report in accordance with the Reissued RCRA Permit, EPA will issue a Statement of Basis and a draft modification to the Reissued RCRA Permit, which will set forth the proposed Remedial Action for the Rest of the River and O&M . . . . EPA will propose this draft permit modification pursuant to the Reissued RCRA Permit and EPA's regulations on RCRA permit modifications (40 C.F.R. § 270.41 and Part 124), including the provisions requiring public notice and an opportunity for public comment on the draft permit modification.").)

As indicated above, this sequential argument, posited by GE as an "alternative," needs to be examined first, since if adopted by the court, the EPA's alleged failure to follow the sequence could preclude it from recovering any costs at this time.

### C. Whether Failure to Follow a Sequential Process Outlined Precludes the EPA from Recovering Any Costs

The Consent Decree, in GE's view, requires completion of the CMS process before the EPA develops and documents a proposal for a remedy.  In essence, GE contends, the EPA's action on the CMS Report is a condition precedent to billing for Future Response Costs.  To date, the EPA has neither approved nor disapproved GE's CMS Report.

GE's sequential argument has some logic but is too narrow.  Granted, a temporal element could explain some of the costs specifically included in one cost-reimbursement provision and excluded from another; for example, the community relations and contractor costs are included in both Oversight Costs and Capped Response Costs but not in Future Response Costs.

14

As the EPA argues, however, GE's position is not supported by the provisions of the Consent Decree taken as a whole.  The definition of Future Response Costs contains no restriction, either express or implied, that such costs are only recoverable *after* the EPA formally acts on GE's CMS.  Similarly, neither  Paragraph 22 of the Consent Decree nor the RCRA Permit, both of which outline the obligations imposed on GE and the EPA in cleaning up the ROR, specify that costs are recoverable by the EPA only after formal action on the CMS Report.  (*See* CD ¶ 22.n; RCRA Permit Part II.H.)  In other words, the process set out in the Consent Decree is not incongruent with the EPA's actions to date and, therefore, does not preclude it from billing and recovering appropriate Future Response Costs at this time.  *See Atl. Sport Boat Sales, Inc. v. Cigarette Racing Team, Inc.*, 695 F. Supp. 58, 61 (D. Mass. 1988) ("One must assume . . . that all parts of the contract are to have meaning.") (citing E. FARNSWORTH, CONTRACTS § 7.11 (1982) and 4 S. WILLISTON, CONTRACTS § 601 (3d ed. 1962)).  Indeed, in apparent contradiction of its own argument, GE does not challenge $46,575 of the costs which the EPA has billed as Future Response Costs.  GE's acknowledgment that such costs fall within the Future Response Costs category, albeit a relatively small percentage of the costs billed, is yet another indication that the three cost categories presently at issue are not as rigid or sequential as GE suggests.

### D. Analysis of Each Contested Cost

The overlying, duplicative and, at times, contradictory language in the Consent Decree has complicated the court's if not the parties' efforts to fit the billed costs into one of the three categories.  As a result, it is understandable why the parties have come to the present impasse.  Simply put, the Consent Decree appears to have been patched

together, having at times more verbiage than precision.  In addition, the Consent Decree does not define many of the term at issue.  To be sure, it does state that the terms defined in CERCLA, RCRA, and/or the regulations accompanying those statutes retain the meaning provided in those laws.  (*See* CD ¶ 4.)  But the parties cite -- and the court has found -- no helpful definitions in those laws.  Morever, all three categories of costs state that the definitions are "including but not limited to" what is listed; this, of course, gives the court some flexibility, but little guidance, in determining the proper category for some of the billed costs.  And one of the most confusing aspects of the Consent Decree is that Future Response Costs and Capped Responses Costs both cover the selection of ROR Action; only one distinction may be drawn easily, namely, that the Capped Response Costs category relates to "field work."

Still, a few guideposts can be culled from the Consent Decree.  First, as the EPA asserts, the definition of Future Response Costs is broader than Oversight Costs and Capped Response Costs.  In contrast to the definition of Future Response Costs, these two categories contain language modifying the scope of "all costs" recovered under each category.  Oversight Costs, for example, include "all costs, including, but not limited to, direct and indirect costs . . . *in conducting* the following [specifically enumerated] activities."  (CD IV, Definitions (emphasis added).)  Capped Response Costs similarly include "all costs EPA incurs . . . including but not limited to direct and indirect costs, *in connection with* studying or otherwise investigating the Rest of River."  (CD IV, Definitions (emphasis added).)

Second, "Future Response Costs" is not a catch-all category, the EPA's argument notwithstanding.  Thus, the court declines the EPA's invitation to focus solely

on whether a cost was simply incurred "pursuant to the Decree."  The actual language in the definition of Future Response Costs is "pursuant to the *provisions* of this Consent Decree."  (CD IV, Definitions (emphasis added).)  Thus, a cost must entail an action contemplated by a specific provision in the decree, not merely be broadly traceable to it. In this regard, in fact, pursuant to the decree GE can actually contest payment of a cost "not within the definition of *any* cost category for which payment is required under Paragraphs 95-99."  (CD ¶ 101(emphasis added).)

Third, the Consent Decree itself acknowledges that the categories of costs are not at all that rigid.  While all three cost categories specify that recovery under one provision is mutually exclusive from recovery under another, the decree recognizes that an activity may overlap two or more categories, whereupon its costs can either be billed in the "cross cutting" category or the EPA can allocate percentages of the costs between categories.  This, of course, does not make for easy sledding.

*1. Community Input Workshops and Charrette, $418,960*

These billed costs include the following: a "situation assessment" to interview the public on their views of the cleanup process, information needs, and concerns; three workshops in April 2011 to present information to the public regarding a variety of ROR issues; and a full-day interactive community workshop, known as charrette, in May 2011.  The EPA allocated twenty percent of the costs associated with these activities over and above the $418,960 to the Oversight Costs category; in doing so, the EPA explained that a small portion of time was spent reviewing or discussing the CMS.

The court finds that all of the remaining costs, *i.e.*, $418,960, most naturally fit into the Oversight Costs category and, therefore, are not properly billed to GE as Future

Response Costs.  As GE argues, these activities constitute the EPA's review of the CMS and/or supplemental or shadow studies, all of which should be associated with "community relations" work in the Oversight Costs category.  The purpose of these activities was to describe to and gather input from the public on the alternatives that the EPA was evaluating, not to support or obtain public input on a selected proposed remedy or even a preferred alternative.  Indeed, the EPA itself stated during these workshops that it had not yet made a decision on a preferred alternative.  *See Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) ("Exploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents.")

To be sure, the EPA has set forth three arguments why these costs nonetheless fall within the Future Response Costs category, but none of these arguments is persuasive.  First, the EPA asserts that the primary purpose of the "community relations" work was to facilitate its decision-making in order to develop a preferred remedy; this work did not constitute "supplemental or shadow studies" because the Consent Decree does not require GE to conduct *any* such studies regarding community reception to alternatives.  The EPA's avowed purpose, however, does not change the fact that it was assessing and weighing the community's response in order to facilitate its decision-making process, not to measure a proposed remedy.  It is not a stretch to characterize the EPA's activities as "supplementing" GE's CMS Report with its own community-assessments.

Second, the EPA argues that these activities were designed to inform its selection of a preferred remedy and represent "non-field work costs incurred for

preparing, reviewing, and approving the documents that propose and select the Rest of River Remedial Action (including responding to public comments thereto)." (CD IV, Definitions.)  In essence, the EPA asks the court to read the above phrase as simply "informing EPA's selection of a preferred remedy."  The court declines to do so.  A "preferred remedy" is not necessarily the same as a "proposed remedy."  Here, the costs involved community relations work in apparent response to GE's report, not the remedy which the EPA proposed.  It would entail a very broad reading of "preparing" and "reviewing the documents that propose and select" to reach the conclusion that these activities constitute Future Response Costs.  In fact, as GE argues, the record confirms that the EPA did not have a proposed alternative at the time.  For example, a May 2012 Status Report stated that the EPA was engaging in "tentative discussion" for one part of the ROR, examining a "potential remedy" for another, and discussing a "proposed approach" for two other locations.  (GE Attach. G; *see also* GE at 15-16.)

Third, the EPA's argument to the contrary, the court does not consider these community relations activities as solicitations of "public comment" within the meaning of Paragraphs 22.n and 22.o of the Consent Decree.  These paragraphs, quoted above, contemplate formal public notice and comment; in contrast, the disputed activities here appear to have been "community relations" work more appropriately fitting into the Oversight Costs category.  (*See also* CD ¶ 213[2].)

---

[2]  XXXVI Community Relations

213.  Settling Defendant shall propose to EPA and the State the extent of its participation in the community relations plan to be developed by EPA.  Settling Defendant shall cooperative with EPA and the State in implementing that plan.  Settling Defendant shall also cooperate with EPA and the State in providing information regarding the Work to the public, including the Citizens' Coordinating Council.  As

*2. Input and Review of Proposed Remedies by the EPA's Internal Review Entities, the National Remedy Review Board and Contaminated Sites Technical Advisory Group, $366,930*

The National Remedy Review Board ("NRRB") and Contaminated Sites Technical Advisory Group ("CSTAG") are comprised of representatives from EPA headquarters and other EPA regions.  As the EPA asserts, the NRRB promotes consistent and cost-effective cleanup decisions and helps ensure that proposed remedies are consistent with law, regulations, policy and guidance.  The EPA submitted a "Site Information Package" to the NRRB containing a lengthy description and "comparative analysis" of the alternatives presented in the CMS Report, totaling over one-hundred pages, as well as twelve pages describing and evaluating Region 1's preferred alternative.  During the dispute resolution process, the EPA allocated ten percent of these costs to the Oversight Costs category, leaving the remaining $366,930 as Future Response Costs.  The court agrees with this classification and is not persuaded by GE's arguments to the contrary.  *Cf. Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 175-76 (1st Cir. 2011) (ruling that under Title VII defendant-employer bears the burden of proving damage caps apply); *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 589 (1st Cir. 1979) ("One of the few principles available to guide us is that normally the party asserting the affirmative of a proposition

---

requested by EPA or the State, Settling Defendant shall participate in the preparation of such information for dissemination to the public, including the Citizens' Coordinating Council, and in public meeting which may be held or sponsored by EPA or the State to explain activities at or relating to the Site.

214.  During the performance of the Work under this Consent Decree, the Parties shall coordinate and cooperate with the Citizens Coordinating Council established with regard to the Site.

should bear the burden of proving that proposition."); *Pac. Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541, 547 (9th Cir. 1949) ("It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action.  It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side.").

As the EPA argues, these costs relate to its "review, preparation and approval of a preferred Remedy" insofar as this process fairly includes discussions and decision-making procedures that go beyond the mere writing of documents.  As the EPA asserts, it is inherent in the Consent Decree that the EPA will deliberate, including obtaining review by the NRRB, before proposing a remedy for public consideration, a process fairly described as "preparing" the documents that propose and select the ROR remedy. In support of this proposition, the EPA appropriately relies on the phrase "non-field work" in the definition of Future Response Costs.

GE nonetheless argues that the analyses by the NRRB and CSTAG are "peer input" or "peer review" falling within the Capped Response Costs category.  In support, GE cites an April 2011 statement by an EPA official that NRRB review is the EPA's "internal peer review process, which must preceded EPA's selection of a remedy proposal."  This argument is bolstered, in GE's view, by the fact that the definition of Capped Response Costs expressly includes the terms "peer input" and "peer review." The court is not persuaded.

For "peer input" or "peer review" to constitute Capped Response Costs, they must be "incurred for the activities described in the first sentence of this definition," *i.e.*,

"in connection with studying or otherwise investigating the Rest of River and/or all field work to support the preparation, development, and selection of the Rest of River Remedial Action." GE offers no explanation as to how analyses by the NRRB and CSTAG would constitute a "study" or "investigation." Moreover, these reviews would not constitute "field work" as the parties have used that term.

Alternatively, GE asserts that these particular costs are Oversight Costs because the NRRB's review was part of the EPA's evaluation of alternatives in the CMS report and/or shadow or supplemental studies of other alternatives. In support, GE offers as evidence a March 2011 statement by the EPA encouraging stakeholders to "submit written comments . . . on the [Revised CMS for [N]RRB consideration." Relatedly, GE contends that the EPA's allocation of ten percent of these costs to Oversight Costs is implausible because the "Site Information Package" submitted by the EPA to the NRRB totaled over one-hundred pages of description and analysis of the alternatives presented in the CMS Report and only twelve pages describing and evaluating Region 1's "preferred alternative."

In relevant part, Oversight Costs are those incurred "in conducting the following activities: . . . reviewing proposals, reports, studies and other deliverables submitted by Settling Defendant under the Reissued RCRA Permit." (CD IV, Definitions.) The CMS Report is a "deliverable[] submitted by Settling Defendant," and the Site Information Package contained a lengthy discussion of that deliverable. However, as previously stated, the NRRB's review can fairly be described as necessary non-field work preparing for documentation of the proposed remedy. Further, GE has offered no explanation as to how the NRRB's review of the Site Information Package constitutes a

22

"study" for purposes of the Oversight Costs category.  The court also notes the contradiction in GE complaining that its remedy alternatives were included in the Site Information Package, while also protesting the fact that the EPA apparently is not obligated to incorporate these alternatives into its decision-making process.

To be sure, GE rightly points out that the Site Information Package contains more than one-hundred pages of information regarding the Revised CMS and only twelve pages on Region 1's "preferred alternative."  However, the Site Information Package is 510 pages long, covers a variety of topics related to the ROR cleanup and is highly technical.  On these facts it is not clear to the court that ten percent allocation to Oversight Costs and the bill to GE for the remainder of the costs is as arbitrary or implausible as GE asserts.

### 3. Legal Fees for the EPA's Attorneys and Advisors, $147,044

The $147,044 in legal fees include time spent by the EPA's technical project manager, its lead attorney for the ROR, and other EPA attorneys working on the remedy.  The EPA maintains that, broadly speaking, these costs are recoverable because they were incurred pursuant to the Consent Decree and do not fall within a capped category.  The EPA further contends that the individuals billed their time as required under the decree and that no further documentation is required.  In response, GE asserts that "remedy preparation" is not "document preparation," and that only the latter may fall within Future Response Costs.  GE again points out that the EPA repeatedly advised the public during FY 2011 that it had made no decision regarding a proposed ROR remedy.

The merits of the parties' arguments are difficult to evaluate on the information

provided.  That said, however, it does appear that recovery of these costs are more dependent upon the court's conclusions regarding recovery of costs in sections (1) community outreach and (2) NRRB/CSTAG above.  And while the EPA maintains that no further documentation would be required, it also suggests that, if this court were to rule that any of the NRRB, Situation Assessment, workshops, or charrette costs in dispute were not properly allocated to Future Response Costs, it would want the opportunity to provide additional information regarding how these individuals spent their time in FY 2011 and re-allocate their time accordingly.  Given its ruling on these other categories, the court agrees that such a re-allocation is appropriate and suggests that, after the EPA does its re-allocation, the parties first try to resolve the matter amongst themselves.

### 4. Costs Incurred by the Department of Justice, $87,000

The parties next debate whether the EPA can recover costs associated with activities performed by the Department of Justice paid under an interagency agreement. The EPA contends these are Future Response Costs because the definition of such costs explicitly mentions costs those incurred by the EPA "and" the Department of Justice, whereas the other categories refer to "interagency and intergovernmental agreement costs" but not specifically to the Department of Justice.  (CD IV, Definitions.) GE, in response, argues that the EPA's argument is flawed because, if correct, any cost incurred by the Department of Justice, even if it falls squarely under another cost category, would be recoverable as Future Response Costs.

GE's concerns are meritorious.  Although the definition of "Future Response Costs" mentions the Department of Justice in its first sentence, the definitions of both

Oversight Costs and Capped Response Costs also include "interagency and intergovernmental agreement costs . . . insofar as such costs are incurred for the activities described in the first sentence of this definition." (CD IV, Definitions.) Those other "agency" costs can easily include the Department of Justice. Thus, if the Department of Justice incurred costs as a result of activities clearly falling within the Oversight Costs or Capped Response Costs categories, the EPA ought not be able to bill those costs as Future Response Costs simply because the Department of Justice is specifically mentioned in that category. That, in the court's estimation, is surely not a fair interpretation of the Consent Decree as a whole. Unfortunately for present purposes, the EPA has not explained what the Department of Justice actually did during FY 2011.

As a result, it is simply not enough, as the EPA posits, that no further documentation by the Department of Justice is necessary because the Consent Decree only requires "a statement that the costs included on the bill are compiled from the EPA or DOJ accounting system and represent only costs incurred in connection with the Site, for the appropriate cost category." (CD ¶ 100.g.) In the court's opinion, the language of the Consent Decree assumes that these costs may fall into other categories. Accordingly, the EPA needs to re-examine the Department of Justice's costs and re-allocate those costs as appropriate among the several cost categories. Once doing so, the EPA should endeavor to resolve the issue with GE before supplementing its memorandum before this court.

*5. Activities Involving the Citizens Coordinating Council, $22,080*

In 1998, the EPA established the Citizens Coordinating Council ("CCC") to inform

the public and obtain input concerning the site's cleanup efforts. CCC members include GE, the EPA, representatives from advocacy groups, and Massachusetts and Connecticut local officials. The Consent Decree expressly recognizes the CCC. (*See* CD ¶¶ 213-14.) The particular costs billed here were incurred for scheduling, facilitating and summarizing CCC meetings. Since portions of the meetings concerned public outreach on ROR alternatives, as well as a range of other topics, the EPA allocated another twenty percent to the Oversight Costs category, with the remaining amount, $22,080, allocated to Future Response Costs.

The EPA maintains that it properly categorized these activities because the Consent Decree expressly contemplates community outreach through the CCC. The EPA also asserts that none of the costs for the meetings at issue were for the primary purpose of "reviewing," "overseeing," or supervising work submitted by GE under the permit. The court disagrees.

Notwithstanding the fact that the Consent Decree expressly contemplates CCC activities, it is difficult to separate the billed activities from the situation assessment, community workshop and charrette costs which the court found to fall in the Oversight Costs category. In essence, the court concluded that these costs were "community relations costs" incurred while the EPA was "otherwise overseeing" GE's activities under the Permit. As explained, it is not reasonable to conclude that the public meetings during the time period at issue were related to "remedy preparation," let alone documentation of a proposed remedy, when the EPA itself was repeatedly representing that it had not selected a remedy and was still evaluating all remedial alternatives.

6. *Costs Associated with the EPA's Contractor ASRC Management Services, Inc.,*

26

*$43,680*

The EPA billed GE for costs it paid its contractor, ASRC Management Services, Inc., for "records management," including digitized GE responses to the EPA's request for information over a decade ago. The EPA previously allocated thirty-five percent of these costs to the cross-cutting costs category.

These are Future Response Costs, the EPA asserts, because they were incurred to "enforce" the Consent Decree and because the management of records enables the EPA to carry out effectively its obligations and responsibilities under the decree. The EPA also argues that these records-management costs do not fall within any capped costs category. Finally, the EPA argues, it provided GE with sufficient information regarding the nature of the records management work. GE counters that there is neither a pending or anticipated enforcement action nor evidence that this records management could relate to a theoretical future enforcement action.

The court finds that these costs cannot fairly be said to have been incurred to enforce the Consent Decree. The costs are also quite general and most naturally fit as indirect Oversight Costs incurred by the EPA while otherwise overseeing GE's activities under the permit. It is also notable that Capped River Costs and Oversight Costs both specifically list "data management," whereas the Future Response Costs category does not.

*7. Cross-Cutting Costs, $106,830*

When costs fall into multiple categories, the Consent Decree allows the EPA to allocate costs among categories using a "reasonable allocation method," referred to by the parties as "cross-cutting costs." The presently contested item, $106,830, consists of

a portion of the EPA's general project costs that the EPA allocated to Future Response Costs based on an establish formula. In light of the court's determinations with respect to the challenged costs discussed above, the EPA should re-calculate the cross-cutting costs and, thereafter, attempt to first resolve the dispute with GE.

### III. CONCLUSION

For the foregoing reasons, GE's motion is ALLOWED in part and DENIED in part as follows. First, utilizing the numbered sections above, the following costs have been properly billed by the EPA as Future Response Costs: (2) input and review by the EPA's internal review entities, NRRB and CSTAG ($366,930), and shall be paid by GE no later than January 17, 2014. Second, the following costs were not properly billed as Future Response Costs: (1) the costs of community input workshops and charrette ($418,960); (5) costs associated with the CCC ($22,080); and (6) costs associated with the EPA's data management contractor ($43,680). Third, the court orders the EPA by January 17, 2014, to re-allocate the following costs in accord with this Memorandum and Order: (3) legal fees for EPA attorneys and advisors ($147,044); (4) those incurred by the Department of Justice ($87,000); and (7) cross-cutting costs ($106,839), and to endeavor by that date to resolve any dispute regarding these re-allocations with GE. If there are any remaining disputes, the EPA shall supplement its memorandum by January 31, 2014, to which GE may respond by February 14, 2014.

IT IS SO ORDERED.

December 5, 2013

  /s/   Kenneth P. Neiman  
KENNETH P. NEIMAN  
U.S. Magistrate Judge